UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-27-13

UALANIA MACK,

                      Plaintiff,

        -against-

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-----------------------------------------------------------x

12 Civ. 186 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

        Plaintiff Ualania Mack, proceeding pro se, seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") that she is not eligible for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq., or Supplemental Security Income under Title XVI of the Act, 42 U.S.C. § 1381 et seq., because she is not disabled within the meaning of the Act. Plaintiff contends that the decision of the Administrative Law Judge ("ALJ") was erroneous, not supported by substantial evidence, and contrary to law.

        Defendant has moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. On June 4, 2013, the Court entered an Order, stating that it would adjudicate defendant's motion as unopposed if it did not receive plaintiff's opposition within 21 days. Plaintiff has not responded to the motion. For the reasons set forth below, the motion is granted.

## I.   PROCEDURAL HISTORY

Plaintiff applied for Social Security benefits on May 29, 2009, claiming primarily that a back disorder prevented her from working. (R. 106-107, 207.)[1]  Her claim was denied on September 20, 2009. (R. 108.)  Plaintiff then requested a hearing. (R. 116.)

The ALJ, Kenneth G. Levin, held a hearing on September 15, 2010, at which plaintiff was not present but was represented by counsel. (R. 58.)  The ALJ received documentary evidence and heard testimony from Dr. Charles M. Plotz, a medical expert, and Ms. Miriam Greene, a vocational expert. (R. 58-66.)  The ALJ issued his decision on September 30, 2010, concluding that plaintiff was not under a disability within the meaning of the Act. (R. 164.)

Plaintiff's counsel sought review of the ALJ's decision by the Appeals Council (R. 177), which, on January 14, 2011, vacated the decision and remanded the matter to the ALJ for further consideration of plaintiff's alleged carpal tunnel syndrome, obesity, and limited use of her hands. (R. 181.)

On July 20, 2011, following the Appeals Council remand, the ALJ held a second hearing, at which plaintiff was present and represented by counsel. (R. 67.)  The ALJ received documentary evidence and heard testimony from plaintiff, as well as Dr. Allan Levine, a medical expert, and Ms. Greene, who testified again as a vocational expert. (R. 67-105.)

On August 5, 2011, the ALJ issued his revised decision, again concluding that plaintiff was not disabled. (R. 14.)  The ALJ expressly incorporated by reference his prior decision except insofar as inconsistent with the later decision. (R. 17.)  The ALJ found that

---

[1] Citations to "(R. ___)" refer to the certified copy of the administrative record of proceedings filed by the Commissioner as part of his answer.

plaintiff met the insured status requirements of the Act through September 30, 2012, and had not

engaged in substantial gainful activity since September 22, 2008, the alleged onset date of her

disability. (R. 23, 24.)  The ALJ found that although plaintiff had certain "severe"

impairments—"mild discogenic and degenerative disease of the lumbosacral spine, possible

chronic cervical strain, and obesity"—she did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (R. 23, 24.)  Further, the ALJ found that plaintiff's residual functional

capacity did not enable her to perform her past relevant work, which was as a day camp

counselor and a home attendant. (R. 6, 171.)  He found, however, that she could perform jobs

existing in significant numbers in the national economy. (R. 24.)  Thus, the ALJ concluded that

plaintiff had not been under a disability, as defined in the Act, from September 22, 2008, through

the date of the August 5, 2011, decision. (R. 24.)

On August 17, 2011, plaintiff requested, through her attorney, review by the

Appeals Council of the ALJ's revised decision. (R. 12.)  By letter dated November 3, 2011, the

Appeals Council informed plaintiff that her request for review had been denied. (R. 1.)

On January 9, 2012, plaintiff filed this action, seeking judicial review of the

Commissioner's final decision.

## II.  EVIDENCE BEFORE THE ALJ

### a.  Plaintiff's Background And Hearing Testimony

Plaintiff was born on October 1, 1967. (R. 202.)  She is five feet tall and weighs

approximately 200 pounds. (R. 206.)  She speaks English. (R. 206.)  She completed school

through the 11th grade and also received training as a home attendant. (R. 212.)  At the time of

her hearing testimony she lived in an apartment with her fourteen-year-old daughter. (R. 70-71.)

3

In applying for Social Security benefits, plaintiff claimed that, following a workplace accident on July 22, 2008, she suffered from a slipped disc, pinched nerves, and asthma, all of which limited her ability to work. (R. 207.) Prior to developing these conditions, plaintiff worked as a day camp counselor from 1996 to 2002 and as a home attendant from 2004 to 2008. (R. 208.) As a camp counselor, she was required to stand and walk for seven hours and sit for one hour each day; she was not required to climb, stoop, kneel, crouch, crawl, or lift or carry objects. (R. 208.)

Plaintiff appeared at the July 20, 2011, hearing with a cane and a brace on her left hand. (R. 72, 90.) Although she testified that the cane had been prescribed by a doctor, she stated that she only used it when attending physical therapy and on the day of the hearing. (R. 72.) Plaintiff testified that she had pain in her lower back and left leg and numbness in her left foot that made the foot feel, but not appear, swollen. (R. 74-75.) She later clarified that her entire left side sometimes felt numb. (R. 92.) She also complained of a "pinched nerve" in her neck, giving her pain on the left side of her head and shoulder. (R. 75.) She stated that about twice a week her hands become numb (or, alternatively, painful) and feel (but do not appear) swollen; her fingers tighten up such that she cannot straighten them for about ten minutes unless someone rubs her hands. (R. 85-87, 90.) She has not taken any pain medications, including over-the-counter medications, since 2010 because they are either ineffective or put her to sleep. (R. 76.) In the past she received "a shot to block the nerve," which temporarily alleviated her pain, as does physical therapy. (R. 77.) She can walk a block, stand for two hours, and sit for two hours. (R. 77-78.) Her symptoms have gotten worse since their onset in 2008 and, approximately three times a week, she feels unable to leave her apartment due to pain. (R. 78, 88.)

Plaintiff testified that she cooks on her own and shops and does laundry with help from her daughter. (R. 79.) She sometimes sleeps for three hours or more during the day. (R. 79.) She occasionally goes out to eat or to the movies with her boyfriend. (R. 81.) As a hobby, she engages in "arts and crafts," although she claims that the onset of carpal tunnel syndrome in both hands has made it more difficult to do so. (R. 82, 83.) She gets around town via "Access-A-Ride," a van service provided by the NYC Transit Authority for people who cannot make use of the subway system. (R. 71.)

b.  <u>Medical Records</u>

On July 23, 2008, plaintiff was admitted to Putnam Hospital Center with complaints of back pain following a workplace injury the previous day. (R. 249.) X-rays revealed, among other things, "partial sacralization of L5,"[2] but no fractures. (R. 252.) Plaintiff was prescribed pain medication and discharged the same day. (R. 251.)

On July 29, 2008, plaintiff was seen at Lincoln Medical and Mental Health Center regarding similar complaints. (R. 474.) Her pain medication was modified and the attending physician believed her capable of performing "light work" for the next month. (R. 475.)

On September 18, 2008, Dr. Jeffrey A. Goldstein, an orthopedist, conducted an initial evaluation of plaintiff, including a physical examination and review of x-rays. (R. 253-255.) Dr. Goldstein's impression was of "[l]umbar sprain/strain" and "[s]pina bifida L5."[3] (R.

---

[2] Sacralization means "incorporation (as of the last lumbar vertebra or any of its parts) into the sacrum; <u>specifically</u> : a congenital anomaly in which the fifth lumbar vertebra is fused to the sacrum in varying degrees." http://www.merriam-webster.com/medical/sacralization.

[3] Spina bifida is "a neural tube defect marked by congenital cleft of the spinal column usually with hernial protrusion of the meninges and sometimes the spinal cord." http://www.merriam-webster.com/medical/spina%20bifida.

255.)  He prescribed physical therapy and pain medication and recommended that plaintiff refrain from work for one week.  (R. 255.)

Dr. Julio Westerband performed an independent orthopedic evaluation on October 22, 2008, diagnosing plaintiff with "[l]umbar spine sprain/strain superimposed on [a] prior fracture to the sacrum."  (R. 420-424.)  He concluded that plaintiff was "capable of working with restrictions to be placed on lifting over 25 pounds" with "no repetitive bending."  (R. 422.) Similar assessments were given by Dr. Westerband on March 17, 2009 (R. 425-429), and by Dr. Shariar Sotudeh on July 22, 2009, and December 2, 2009.  (R. 430-444.)

Dr. Jacob Nir performed neurological tests on October 24, 2008.  (R. 358-61.) His diagnosis was "Bilateral L5/S1 Lumbar Radiculopathy/Sciatica Left More Severe."[4]  (R. 358.)

Dr. Ranga Krishna conducted a neurological examination of plaintiff on November 10, 2008, concluding that her clinical features were "consistent with post traumatic headache, cervical and lumbar radicilopathy [sic]."  (R. 560-565.)  Dr. Krishna repeatedly indicated that plaintiff had a "total" or "100%" impairment on worker's compensation forms. (R. 362-385, 564.)

On January 13, 2009, Dr. Stanley Liebowitz, an orthopedist, completed a preliminary medical report based on two examinations of plaintiff as well as an MRI performed in December 2008.  (R. 569-572.)  He noted a reduced range of motion in plaintiff's spine and shoulder.  (R. 570, 571.)  He also noted that plaintiff "was unable to use her left arm

---

[4] Radiculopathy refers to "any pathological condition of the nerve roots."  http://www.merriam-webster.com/medical/radiculopathy.  Sciatica means "pain along the course of a sciatic nerve especially in the back of the thigh caused by compression, inflammation, or reflex mechanisms; broadly : pain in the lower back, buttocks, hips, or adjacent parts."  http://www.merriam-webster.com/medical/sciatica.

functionally" and "needs support arising from a chair." (R. 570, 571.) He diagnosed plaintiff as having a number of "[p]ost traumatic" conditions in her spine and shoulder and indicated plaintiff's "inability to perform usual and customary daily activities," including shopping, work, and social activities. (R. 572.) On April 14, 2009, Dr. Liebowitz assessed plaintiff as 100% impaired on a worker's compensation form. (R. 286.)

Dr. Vosough conducted further nerve conduction studies of plaintiff on April 27, 2009, finding "evidence of left C5-C6 radiculopathy." (R. 386-89.)

Dr. Dipti Joshi completed a consultative internal medicine examination on September 18, 2009. (R. 237.) Dr. Joshi noted, among other things, that plaintiff appeared to have a normal gait and needed no assistance changing or getting onto or off of the exam table or a chair. (R. 239.) Dr. Joshi also noted that plaintiff's dexterity and grip strength were intact. (R. 240.) Based on plaintiff's self-reported history of carpal tunnel syndrome, Dr. Joshi indicated that plaintiff should avoid repetitive motions with her right hand. (R. 240-241.)

Dr. Pramila Kolisetty performed additional neurological tests on October 21, 2009, finding "no evidence of carpal tunnel syndrome [or] cervical radiculopathy at this time." (R. 323.)

Dr. Paul Khoury performed an MRI of plaintiff's cervical spine on November 30, 2009. (R. 608.) He noted "[s]traightening of the cervical lordosis with minimal cervical lordosis at C5-C6 with a small midline disc protrusion indenting the sac with no evidence of extruded disc material, cord compression or severe stenosis." (R. 608.) He stated that "[v]isualized foramina are symmetric and unremarkable." (R. 608.)

On March 3, 2010, Dr. Sotudeh, who had earlier advised work restrictions due to plaintiff's back condition, concluded that "[f]rom [an] orthopedic point of view Ms. Mack is

capable of working without restrictions as it relates to the accident of 7/22/08" and that "no further casually related orthopedic treatment, including physical therapy, would be reasonable, related, or necessary." (R. 449.)

Dr. Okon Umana, who specializes in pediatrics (R. 548), evaluated plaintiff on a number of occasions in 2009 and 2010. (R. 547-548, 587-588, 594-600, 605-606, 609-610, 617-618, 625-626.) Dr. Umana consistently indicated on worker's compensation forms that plaintiff was "100%" or "totally" disabled due to her workplace accident. (E.g. R. 587-588, 594-597, 599-600.) On April 12, 2010, Dr. Umana indicated that plaintiff should avoid lifting more than five pounds or standing or walking for two hours or more during the workday. (R. 547.)

The record also includes evaluations by chiropractors. Dr. Barry Pinchefsky indicated that, as of October 31, 2008, plaintiff had a decreased range of motion. (R. 555-556.) Dr. Michael Weintraub assessed plaintiff as totally disabled on worker's compensation forms in 2008 and 2009, diagnosing plaintiff with lower back syndrome, disc displacement, and lumbar radiculopathy. (R. 263-268, 271, 275-80, 282-85, 288-90.) Dr. Andrew Millar assessed plaintiff has having a "100%" impairment on workers' compensation forms in 2009 and 2010, diagnosing her with lumbar disc displacement and radiculopathy. (R. 292-357, 589-592.)

Finally, the record indicates that plaintiff was treated at Lincoln Medical and Mental Health Center for pain in her wrist in 2009. (R. 496-501.) Upon arrival at the hospital in on August 27, 2009, plaintiff reported pain from falling on her wrist in June 2009. (R. 496.) The attending physician gave her Tylenol and replaced her soft wrist brace with a split. (R. 496.) There was no evidence of a fracture or dislocation. (R. 498.) Plaintiff returned to the hospital in September 2009 and October 2009 but was only diagnosed with wrist strain at an unspecified site. (R. 499-501.)

c. <u>Medical Expert Testimony</u>

Dr. Charles M. Plotz, M.D., an internist with a specialty in arthritis (R. 167), testified as a medical expert at the hearing on September 15, 2010. He briefly reviewed plaintiff's relevant medical background, noting that, following her workplace accident, she reported pain in her lower back but that x-rays and nerve conduction studies were negative. (R. 61, 62.) He also noted plaintiff's history of asthma, carpal tunnel syndrome (which he stated "does not seem to be a significant factor at the time under consideration"), hernia repairs in 2004 and 2010, a sacral fracture approximately 20 years ago (which "apparently healed without event"), and her obesity. (R. 62.) Dr. Plotz testified that plaintiff "should have no problem with sitting" and that "[s]tanding and walking combined would probably be somewhere in the two to four hour range." (R. 63.) "Lifting and carrying would be in the 10 pound range." (R. 63.)

Dr. Allan Levine, M.D., an orthopedic surgeon (R. 17), testified as a medical expert at the July 20, 2011, hearing. Based on plaintiff's medical records and her testimony, Dr. Levine identified three medically determinable impairments. First, he testified that plaintiff suffered from "chronic back pain" caused by a congenital abnormality in the lower most vertebra, possibly aggravated by the July 22, 2008, accident. (R. 94.) Second, plaintiff suffered from "chronic neck pain and left upper extremity pain . . . secondary to a muscle strain." (R. 96.) Third, plaintiff was obese. (R. 99.) Dr. Levine opined that the record did not support a diagnosis of carpal tunnel syndrome. (R. 99.) He also stated that "numbness of an entire part, let alone an entire left side of the body, is a non-anatomic, non-organic, non-dermatomal type of pattern that just cannot be accounted for on any organic basis." (R. 99.) As to plaintiff's residual functional capacity, Dr. Levin testified as follows:

9

> I feel that claimant should be capable of lifting occasionally 15
> pounds, frequently 10, but not overhead or above shoulder level . .
> . . I believe she should be able to sit six out of eight hours, [with]
> customary breaks. I believe she should be able to stand four out of
> eight hours with customary breaks. I believe she should be able to
> walk two out of eight hours, but no longer than 20 minutes at one
> time without the ability of sitting for two to three minutes just to
> change the strain on the lower back. She should be able to
> occasionally navigate stairs, crouch and stoop, but not repetitively.
> I believe she should avoid ladders, crawling, heavy, vibratory
> machinery, unprotected heights, extreme cold exposure or kneeling
> and based on objective finds in the medical record, I believe she
> has unlimited use of the upper extremity for fine and gross
> manipulation.

(R. 101.)

### d. Vocational Expert Testimony

Ms. Greene testified as a vocational expert at both hearings. At the second hearing, the ALJ asked her to assume the residual functional capacity put forward by Dr. Levine and to limit her answer to jobs that require only "simple and routine" work. Ms. Greene testified that there were several "sedentary" and "light" jobs that plaintiff could perform and that were available in abundance in the local and national economies. (R. 102-103.) These included telephone sales (10,000 jobs locally and 600,000 nationally), jewelry bench work (1,000 and 50,000), box office cashier (2,000 and 200,000), and surveillance system monitor (1,000 and 250,000). (R. 103.) Upon inquiry by plaintiff's counsel, Ms. Greene stated that it would not be possible for a person to complete these jobs if they were required to lie down for an hour and a half during the day. (R. 104.)

### III. APPLICABLE LAW

### a. Standard Of Review

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the

pleadings only if she establishes "that no material issue of fact remains to be resolved and that [she] is entitled to judgment as a matter of law." Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990) (citation and quotation marks omitted). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).

Review of the Commissioner's final decision denying disability benefits is limited. A court may not review the Commissioner's decision de novo. See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); see Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Therefore, a court's review involves two levels of inquiry. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). First, the court must review "whether the Commissioner applied the correct legal standard," id., including adherence to applicable regulations, see Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. Tejada, 167 F.3d at 773.

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotation marks omitted). "The substantial evidence test applies to inferences and conclusions drawn from basic evidentiary facts as well as

the facts themselves." Murphy v. Sec'y of Health & Human Servs., 62 F. Supp. 2d 1104, 1106 (S.D.N.Y. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). The reviewing court views the evidence as a whole, not in isolation, see Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990), and the fact that there is substantial evidence contrary to the Commissioner's decision does not require that it be disturbed so long as substantial evidence also supports it, see DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998).

It is the function of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant." Carroll v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir.1983). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." Veino, 312 F.3d at 588.

Finally, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," regardless of whether the claimant is represented by counsel. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). The Court must be satisfied that the claimant received a full hearing, consistent with the purposes of the Act. See Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982).

b. Five-Step Disability Determination

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 42

U.S.C. § 1382c(a)(3)(A).  The Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).  Work that exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner's determination of a claimant's disability follows a five-step sequential analysis promulgated by the Social Security Administration (the "SSA").  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described this analysis as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citation and quotation marks omitted; brackets and omission in original).  The claimant bears the burden of proof for the first four steps; the burden shifts to the Commissioner at the fifth step.  See Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

"In making his determination by this process, the Commissioner must consider four factors: (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted).  Further, the Commissioner "shall consider the combined effect of all the individual's impairments . . . ."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

c.   The Treating-Physician Rule

The opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment(s)" will be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).  "[T]he lack of specific clinical findings in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit the physician's opinion."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so.  Id.

If not afforded controlling weight, a treating physician's opinion is given weight according to a number of factors, including (i) the frequency of examinations and the length,

nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Clark, 143 F.3d at 115.

A chiropractor's opinion is not a medical opinion and is therefore not covered by the treating-physician rule.  See Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  "[T]he ALJ has the discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before him . . . ."  Id. at 314.

Finally, the opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

d.  Subjective Claims Of Pain

The subjective experience of pain can constitute a disability if it derives from a physical or mental impairment and is so severe "as to preclude any substantial gainful employment."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983); see Gallagher on Behalf of Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983); 20 C.F.R. §§ 404.1529, 416.929.  Subjective complaints alone, however, are not "conclusive evidence" that a person is disabled, 42 U.S.C. § 423(d)(5)(A), and the ALJ may evaluate the credibility of a plaintiff who claims to experience pain, see Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

IV. DISCUSSION

As explained below, the ALJ properly applied the five-step sequential analysis to determine that plaintiff is not disabled.  That decision was supported by substantial evidence in the record.  Thus, the Court affirms the Commissioner's final decision.

At the first step, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the date of her accident, September 22, 2008.  (R. 23.)  This was consistent

with the evidence in the record, including plaintiff's hearing testimony that she spends a typical day at physical therapy and at home sleeping and watching TV. (R. 79-81.)

Second, the ALJ considered whether plaintiff had a "severe" impairment, finding that she suffered from three: "mild discogenic and degenerative disease of the lumbosacral spine, possible chronic cervical strain, and obesity." (R. 23.) The ALJ credited the testimony of Dr. Levine, which he found to be "well supported by the evidence," adding that it "very closely resembles the conclusions that Dr. Plotz drew from the records at the previous hearing." (R. 22.) The ALJ did not find that plaintiff had carpal tunnel syndrome, despite her self-reporting of the condition, noting that there was no positive diagnosis for the condition in the record and that a diagnostic test had been negative. (R. 23.) The ALJ found that, to the extent plaintiff suffered from asthma, there was no indication that it affected her ability to work; indeed, at the hearing, plaintiff did not identify asthma when asked what impairments inhibited her ability to work. (R. 23.) Further, the ALJ credited Dr. Levine's testimony that plaintiff's complaints of numbness in her left side and foot were "entirely non-anatomic and nondermatomal and cannot be accounted for on any organic basis." (R. 22.)

Third, the ALJ determined that plaintiff did not have an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 24.) Indeed, plaintiff's counsel did not contend otherwise. (R. 23.)

Fourth, the ALJ considered whether, despite plaintiff's severe impairments, she had the residual functional capacity to perform her past work. The ALJ credited Dr. Levin's testimony, finding that plaintiff's residual functional capacity included sitting for 6 to 8 hours in a workday with customary breaks; standing for 4 hours in such a day with customary breaks; and walking 2 hours in such a day, but not for more than 20 minutes at any one time. (R. 22, 24.)

Further, the ALJ found that plaintiff could lift and carry 15 pounds occasionally and 10 pounds frequently, but not above shoulder level. (R. 22, 24.) He found that she could negotiate stairs, crouch and stoop occasionally but not repetitively, and that she should avoid ladders, crawling, heavy vibratory machinery, unprotected heights, kneeling, and extremes of cold. (R. 22, 24.) Consistent with the testimony of Ms. Greene, the vocational expert, the ALJ concluded that this residual functional capacity did not enable plaintiff to perform her former work as a day camp counselor or home attendant, which required, among other things, standing for extended periods. (R. 24, 171, 208.)

In adopting Dr. Levine's functional assessment, the ALJ did not give controlling weight to any doctor's opinion under the treating-physician rule. Nor does plaintiff, proceeding pro se on a form complaint, attempt to identify which of her many examining doctors, if any, constituted a treating physician. Doctors Weintraub and Millar are chiropractors, not medical doctors, and therefore cannot be considered treating physicians for the purpose of applying the treating-physician rule. See Diaz, 59 F.3d at 313. Plaintiff's medical records show that she saw most of the remaining doctors on a limited basis for consultative visits or diagnostic tests. The two notable exceptions are Drs. Umana and Liebowtiz, each of whom examined plaintiff on several occasions and gave a functional assessment more favorable to plaintiff than that of Dr. Levine. Either doctor could arguably be considered one of plaintiff's treating physicians.

Dr. Umana, whom the ALJ characterized as "[o]ne of the Claimant's treating doctors" (R. 170), examined plaintiff repeatedly in 2009 and 2010. The ALJ noted that Dr. Umana was the only doctor to give plaintiff a functional assessment less favorable than that given by Dr. Plotz, i.e. a functional rating below the sedentary level. (R. 170, 171.) The ALJ did not credit this rating, however, reasoning that Dr. Umana's "specialty (pediatrics) is far removed

17

from the conditions he was basing his rating on, and numerous specialists (orthopedists, an arthritis specialist, an internist) contradict him." (R. 171.)  The ALJ also pointed out that, according to Dr. Plotz's hearing testimony, "not even Dr. Umana's own records (or those from others in his clinic) support his severe functional assessment." (R. 171.)  Dr. Umana's assessment was contradicted by, among others, Drs. Goldstein, Westerband, and Sotudeh, each an orthopedic specialist who examined plaintiff.  Dr. Sotudeh, in particular, examined plaintiff on at least three occasions between July 2009 and March 2010 and concluded after his final examination that plaintiff was no longer suffering any ill effects from her workplace accident. (R. 449.)  Thus, even assuming that Dr. Umana was one of plaintiff's treating physicians, Dr. Umana's opinion was contradicted by substantial evidence in the record, including contrary evaluations by examining doctors with relevant specialties, such that the ALJ was justified in not affording it controlling weight.

Dr. Liebowitz's, an orthopedist, saw plaintiff on at least three occasions and might also be considered a treating physician.  Dr. Liebowtiz's functional assessment was fairly limiting, indicating plaintiff's "inability to perform usual and customary daily activities, such as: Shopping, grooming, work, social/physical activities, physical exertion since her injuries." (R. 572.)  While Dr. Liebowitz's conclusion that plaintiff was unable to work is not controlling, 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1), his report states that plaintiff suffered from a limited range of motion, diminished grip strength in her left hand, and an inability to use her left arm functionally. (R. 570, 571.)  Again, however, Dr. Liebowitz's functional assessment was contradicted by the assessments of other orthopedists, including Dr. Sotudeh, who examined plaintiff on multiple occasions.  Thus, although Dr. Liebowtiz possessed a relevant specialty, his

18

assessment, like that of Dr. Umana, was contradicted by substantial evidence in the record and was not entitled to controlling weight.

The ALJ also did not defer to indications on worker's compensation forms, some by chiropractors, that plaintiff was "totally" or "100%" disabled, noting that the designations were for the most part "concuso[y]" and supported by "only sloppy and uninformative chart notes." (R. 21.) In any case, the designations were provided for the purpose of assessing whether plaintiff was entitled to worker's compensation, not Social Security benefits (R. 21), and are not controlling. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Moreover, the ALJ pointed to "serious credibility problems" with plaintiff's testimony, including her subjective claims of pain. (R. 22.) In particular, plaintiff admitted at the hearing that she only used her cane when attending the hearing and physical therapy, which, in the ALJ's view, "suggests that she uses the cane only when she wishes to impress a third party with the severity of her conditions" and "shows that she has no medical need for the cane." (R. 22.) The ALJ also noted plaintiff's conspicuous use of a wrist brace at the hearing, purportedly for her carpal tunnel syndrome, a condition that plaintiff had not been diagnosed with and for which she admitted she had not recently received any treatment. (R. 22.) Finally, plaintiff admitted that she currently took no pain medication whatsoever, arguably undermining her claims of pain. (R. 22.)

Fifth, and finally, the ALJ considered whether there was other work that plaintiff could perform. The ALJ credited Ms. Greene's testimony that the residual functional capacity outlined by Dr. Levine would enable plaintiff to undertake several jobs existing in significant numbers in the national economy, including that of telephone sales person (10,000 jobs locally and 600,000 nationally), jewelry bench worker (1,000 jobs locally and 50,000 nationally),

surveillance system monitor (1,000 jobs locally and 250,000 nationally), and box office cashier (2,000 jobs locally and 200,000 nationally).  (R. 24.)

Thus, using the correct five-step analysis, and based on substantial evidence in the record, the ALJ found that plaintiff had not been under a disability, as defined in the Act, during the relevant time period.  (R. 24.)

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings (Dk. No. 14) is GRANTED.  The Clerk is directed to close the case.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        September 26, 2013